IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 11, 2017 Session

## SHEDDRICK HARRIS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 09-00594     W. Mark Ward, Judge**

_____

**No. W2016-00904-CCA-R3-PC**
_____

The Petitioner, Sheddrick Harris, appeals from the denial of his petition for post-conviction relief, wherein he challenged his jury convictions for first degree felony murder and especially aggravated robbery. See Tenn. Code Ann. §§ 39-13-202(a)(2), -403. In this appeal as of right, the Petitioner raises the following ineffective assistance of counsel claims: (1) that trial counsel was ineffective for failing to inform the Petitioner that he had a constitutional right to a trial before a different judge than the one who signed the search warrant for the Petitioner's automobile; (2) that trial counsel was ineffective for failing to seek recusal of the trial judge because the trial judge had an ex parte communication with a head deputy that led to enhanced courtroom security procedures, evincing the trial judge's bias against the Petitioner, and because the trial judge was the same judge who issued the search warrant; (3) that trial counsel was ineffective for failing to challenge the warrantless search of the Petitioner's vehicle, failing to challenge the search warrant by requesting a Franks v. Delaware, 438 U.S. 154 (1978) hearing, and failing to challenge the Petitioner's illegal detention effectuated without probable cause and without an arrest warrant and solely for the purpose of gathering additional evidence against the Petitioner; and (4) that trial counsel failed to adequately impeach an attorney witness who was facing disciplinary action by the Board of Professional Responsibility at the time of the Petitioner's trial.[1] After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

---

[1] We have restructured the Petitioner's ineffective assistance of counsel claims for the purposes of clarity and efficiency.

Seth M. Segraves (on appeal) and Michael R. Working (at hearing and on appeal), Memphis, Tennessee, for the appellant, Sheddrick Harris.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and D. Gregory Gilbert and Omar Z. Malik, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

In August 2010, a Shelby County jury convicted the Petitioner of first degree felony murder and especially aggravated robbery in connection with "an ill-fated drug deal turned robbery during which the victim . . . suffered the theft of over $10,000 and a fatal gunshot wound to the chest." State v. Sheddrick Harris, No. W2010-02512-CCA-R3-CD, 2012 WL 29203, at *1 (Tenn. Crim. App. Jan. 5, 2012), perm. app. denied (Tenn. May 16, 2012). For these crimes, the Petitioner was sentenced to life imprisonment without the possibility of parole for the murder conviction and to a consecutive sixty years for the especially aggravated robbery conviction. Id.

A. Trial. The thirty-eight-year-old victim, Corey Lester, was found shot to death in his Memphis home on May 20, 2008. Harris, 2012 WL 29203, at *1. He had suffered gunshot wounds to the left side of his chest, his left knee, and his right knee. Id. at *5. According to the medical examiner, the chest injury was not survivable. Id.

Memphis Police Department ("MPD") Detective Charles Teeters arrived at the victim's home after the victim's body had been removed and observed what appeared to be a "sizeable amount of cocaine" on the kitchen counter. Harris, 2012 WL 29203, at *4. According to Detective Teeters, he believed "the substance to be approximately two kilos of cocaine based upon its appearance and packaging[,]" but when he sampled the substance, it did not have "the normal texture" of cocaine. Id. Detective Teeters performed a field test of the substance that did not produce a "positive test for cocaine," and later testing at the property room confirmed that the substance was in fact not cocaine. Id. There was, however, a small amount of cocaine recovered from a saucer on the kitchen counter. Id. In addition, another detective recovered the victim's wallet from the master bedroom, which contained approximately $500 inside. Id. at *5.

MPD Detective Alpha Hanks processed the crime scene, noting spent shell casings found in the front doorway, in a kitchen garbage can, and behind the living room couch. Harris, 2012 WL 29203, at *4. She also documented a blood trail leading from the kitchen to the victim's body near the pool table, bullet holes in the couch, and one bullet

hole in a pair of blue jeans. Id. She collected five spent .380 casings and two spent bullets for ballistics testing. Id.

Two witnesses, Derron Macklin and Rocky[2] Hilliard, placed the Petitioner at the scene of the victim's murder. At the Petitioner's trial, they testified to the following:

Derron Macklin had known the victim "about a year" and considered the victim a friend. On May 20, 2008, Mr. Macklin and another individual, Rock[y] Hilliard, met with the victim at a Memphis Marshall's department store to arrange a drug deal with the [Petitioner], whom Mr. Macklin knew as "Sed." As Mr. Macklin explained, "[Mr. Hilliard] knew where some drugs w[ere] and that [the Petitioner] want[ed] to see the money first." Mr. Macklin, however, became nervous about the drug deal because "who in their right mind is going to show you the money first without seeing the product." After arranging a meeting between the victim and the [Petitioner] for later that day, Mr. Macklin telephoned the victim and told the victim that he was not "comfortable with what was fixing to go down" and attempted to call off the transaction. The victim, however, told Mr. Macklin that he would "go through" with the meeting.

Mr. Macklin and Mr. Hilliard picked up the [Petitioner] at a Fred's store and drove to a Shell station near the victim's home. The victim had told Mr. Macklin that he did not want Mr. Hilliard to come to his home because Mr. Hilliard had been recently paroled from federal prison. Therefore, Mr. Macklin, Mr. Hilliard, and the [Petitioner] met the victim at the Shell station, where the [Petitioner] and Mr. Macklin got into the victim's white pickup truck and went to the victim's home.

When they arrived at the victim's home, Mr. Macklin went into a living room area and began "racking up" a game of pool at the victim's pool table. The [Petitioner] received a phone call and "his whole attitude changed." The [Petitioner] demanded to see the money, so the victim "brought out a little black pouch" containing money and placed it on the kitchen table. The [Petitioner] became angry over the amount of money presented. When the victim said, "[T]hat's all the money I got," the [Petitioner] shot the victim in the leg. The [Petitioner] then asked for "the rest of the money." When the victim told him that the money was "back there" in the victim's bedroom, the [Petitioner] directed Mr. Macklin to retrieve the money from the victim's bedroom dresser. Mr. Macklin went

_____

[2] Sometimes this witness's first name is spelled "Rockie," but we will refer to him as "Rocky" to be consistent.

-3-

to the victim's bedroom and returned with another small container of money.

Next, the [Petitioner] ordered the victim and Mr. Macklin to the living room couch. The [Petitioner] forced the victim and Mr. Macklin to "strip down to [their] underwear" and told them that he was "going to have to . . . kill [them]." Both men begged for their lives. When the [Petitioner] telephoned someone but got no answer, the victim offered the [Petitioner] any of his vehicles in return for leaving them without any further harm. The [Petitioner] instructed Mr. Macklin to dress and go start one of the vehicles—either a white pickup truck or a Corvette. The [Petitioner] stood in the doorway of the home, watching both the victim and Mr. Macklin, as Mr. Macklin walked outside to start the victim's white pickup truck. Mr. Macklin "got around the truck [and] stuck the key in the ignition[, but] it didn't fit. So [he] laid down and ran."

Mr. Macklin fled the victim's driveway and ran door to door seeking help. Unable to summon any help from neighbors, Mr. Macklin went to the Shell station where he telephoned Vincent Halliburton to warn him of what had occurred because Mr. Halliburton was on his way to the victim's home. Mr. Macklin then telephoned 9-1-1 to report the shooting and returned to the victim's home to meet the police.

As Mr. Macklin walked back to the victim's home, he saw the [Petitioner] and Mr. Hilliard in Mr. Hilliard's car. When Mr. Hilliard and the [Petitioner] saw Mr. Macklin, "they hit the brakes so [he] just stepped over in the bushes and then they left." When Mr. Macklin returned to the victim's home, Mr. Halliburton was already standing outside. Mr. Macklin told Mr. Halliburton that he and the victim had been robbed. Mr. Macklin looked inside the door and saw the victim lying on his back by the pool table.

The police soon arrived, and Mr. Macklin gave them a statement during which he "tried to shy away" from discussion of the drugs because he did not want to be charged in any conspiracy concerning the drugs. Later at the police station, however, Mr. Macklin admitted to police that he had been untruthful at the scene and "told them everything [he] knew at that point," including identifying the [Petitioner] as the shooter. He testified, "I told [the police] that . . . we [were] there to buy drugs and we [were] getting them from [the Petitioner] and he pulled up a gun and robbed us." Mr. Macklin only witnessed the [Petitioner's] firing the first shot in the victim's leg, did not see any other shots fired, and did not see the drugs at any time.

-4-

At trial, Mr. Macklin denied visiting the [Petitioner's] home on the day of the shooting.

Rocky Hilliard had known the [Petitioner] approximately six to [twelve] months at the time of the shooting. He met the victim for the first time on May 20, 2008. Mr. Hilliard assisted Mr. Macklin in setting up the drug deal by getting Mr. Macklin in touch with the [Petitioner]. Mr. Hilliard also expressed some reservations about the deal and told Mr. Macklin and the victim to "leave it alone." Mr. Hilliard testified that when he and Mr. Macklin picked up the [Petitioner] at the [Petitioner's] home, Mr. Macklin went inside the [Petitioner's] home for "maybe five minutes" before both men came outside and got into Mr. Hilliard's car. Mr. Hilliard recalled that the [Petitioner] carried a large "dark black" bag to the car, which he assumed contained drugs. Mr. Hilliard drove the men to the Shell station to meet the victim and waited at a "wing place" restaurant near the Shell station while the men went to the victim's home.

Mr. Hilliard spent [thirty] to [forty] minutes "just sitting" at the restaurant while the men were at the victim's home. At one point, he telephoned the [Petitioner] to ask what was taking so long, and the [Petitioner] told him that they were about to test the drugs. Sometime later, Mr. Macklin telephoned Mr. Hilliard, told him "you set us up," and hung up the phone. Soon thereafter, the [Petitioner] telephoned Mr. Hilliard for a ride and told Mr. Hilliard that the victim and Mr. Macklin were "trying to rob" him. Mr. Hilliard picked up the [Petitioner] on a nearby street and took him home. On the trip to the [Petitioner's] home, the [Petitioner] repeatedly told Mr. Hilliard that the other men had tried to rob him.

Mr. Hilliard left the [Petitioner] at the [Petitioner's] home and traveled alone to Tunica, Mississippi. A[n MPD] detective telephoned Mr. Hilliard in Tunica to ask him who killed the victim. Mr. Hilliard was "shocked" to learn of the victim's death. The next morning and while accompanied by his attorney, Mr. Hilliard gave a statement to the detectives and identified the [Petitioner] from a photographic lineup.

Harris, 2012 WL 29203, at *1-3 ("defendant" altered to "Petitioner" throughout; all other alterations in the original).

Javier Bailey, Mr. Hilliard's attorney, testified at the Petitioner's trial that he received a telephone call from Mr. Hilliard in the "wee hours of the morning" of May 21, 2008. Harris, 2012 WL 29203, at *4. He agreed to meet Mr. Hilliard at his office and

accompany him to the MPD station later that morning, where Mr. Hilliard gave a statement to MPD detectives. Id.

Robert Lambe testified at the Petitioner's trial that he sold the Petitioner his 1998 black Cadillac DeVille at approximately 7:30 a.m. on May 21, 2008. Harris, 2012 WL 29203, at *4. According to Mr. Lambe, the Petitioner paid $4,900 cash, and he gave the Petitioner a bill of sale and title transfer. Id. Mr. Lambe further testified that he had removed all of his personal property from the vehicle prior to selling it and that he did not leave over $13,000 in cash inside the vehicle or a Lorcin .380 pistol in the glove compartment. Id.

MPD Detective Michael Garner arrested the Petitioner at a Memphis muffler shop on May 21, 2008. Harris, 2012 WL 29203, at *4. "The [Petitioner] did not immediately submit, but when cornered by Detective Garner and his team, the [Petitioner] 'gave up.'" Id. Although the Petitioner told Detective Garner that he did not have a vehicle at the shop, the Petitioner "held a set of keys in his hand at his arrest. The officers confirmed the keys belonged to a black Cadillac DeVille parked on the lot. A plain view search of the vehicle uncovered paperwork relevant to the [Petitioner's] recent purchase of the car that morning." Id. MPD Detective Samuel McMinn assisted Detective Garner in the Petitioner's arrest, testifying "at trial consistently with Detective Garner's testimony concerning the circumstances of the [Petitioner's] arrest and search of the vehicle." Id.

MPD Detective Barry Hanks prepared the search warrant for the Petitioner's vehicle and conducted the search. Harris, 2012 WL 29203, at *5. Detective Hanks "discovered paperwork concerning the [Petitioner's] ownership of the vehicle and receipts showing the [Petitioner's] payment of fines on the morning of May 21 in order to have his driving privileges reinstated." Id. Another officer found "two boxes containing a large amount of money in the backseat" of the Cadillac and a handgun in the glove compartment. Id.

On cross-examination, Detective Hanks acknowledged that he had averred in the search warrant affidavit that no money was recovered at the victim's residence. Harris, 2012 WL 29203, at *5. He explained, however, that "with the quantity of drugs or suspected drugs that was on the scene," he was thinking about "a large amount of money" that would be needed "to purchase a kilo of cocaine" and that he "did not even think about the five hundred dollars" found in the victim's wallet when preparing the affidavit. See id. He was also asked about his statement in the affidavit that he did not know how Mr. Macklin left the scene. Detective Hanks believed that statement to be true, reasoning,

When [Mr. Macklin] got a chance[,] he left the scene, [and] he went down to a service station to try to summon help. . . . [H]e saw [the

-6-

Petitioner] later leaving the area with Rock[y,] but he did not see [the Petitioner] come out of the house and get into Rock[y]'s car and leave because he also was gone from the scene.

Special Agent Raymond DePriest, a firearms examiner, determined that the Lorcin .380 semi-automatic pistol found in the glovebox of the Cadillac was "fully functional." Harris, 2012 WL 29203, at *5. "Through his examination of the shell casings and bullets recovered at the scene, he determined that they all were consistent with having been fired from the pistol. Likewise, he determined that the bullets recovered from the victim's body had been fired from the same pistol." Id.

B. Post-conviction. Following his unsuccessful direct appeal, the Petitioner filed a timely pro se petition for post-conviction relief. Counsel was appointed, and two successive amended petitions were filed. The Petitioner claimed that he received ineffective assistance of counsel in the following ways: (1) trial counsel failed to inform the Petitioner of his constitutional right to have a trial judge other than the one who signed the search warrant preside over his case; (2) trial counsel failed to move for recusal of the trial judge; (3) trial counsel failed to "move for suppression, based upon the unlawful seizure and search, of [the] Petitioner and the gun and currency found" in the black Cadillac; (4) trial counsel failed to impeach attorney Javier Bailey; (5) trial counsel failed to obtain and present evidence of the Petitioner's financial records; (6) trial counsel failed to adequately investigate "all aspects of the case"; (7) trial counsel failed to obtain a mitigation expert for the Petitioner's sentencing phase; (8) trial counsel failed to adequately meet and communicate with him; and (9) trial counsel failed to adequately investigate and present mitigation evidence at the sentencing phase. He also alleged a Brady violation and that appellate counsel was ineffective for failing "to raise all non-frivolous issues" on appeal.

Thereafter, hearings were held on March 31, April 6, and April 8, 2016. We will limit our recount of the facts from the post-conviction hearings to those that are relevant to the ineffective assistance claims the Petitioner presents on appeal.

Trial counsel testified that he represented the Petitioner in both federal and state court for charges relating to the victim's death. In federal court, trial counsel obtained an acquittal for the Petitioner on the charge of being a convicted felon in possession of a firearm. Trial counsel maintained that the defense prevailed at the federal trial because the jurors did not find Mr. Macklin or Mr. Hilliard credible, so their strategy "remained consistent" in state court to likewise challenge their credibility. Trial counsel also proffered as a reason for the federal acquittal that the jurors may have believed that Mr. Hilliard planted the gun in the Petitioner's Cadillac.

Trial counsel recollected that Mr. Hilliard's attorney, Javier Bailey, testified at the Petitioner's state trial, although Mr. Bailey did not testify in the federal trial. According to trial counsel, Mr. Hilliard was "less than credible" at the federal trial, but Mr. Bailey provided Mr. Hilliard with an alibi at the state trial, thus boosting Mr. Hilliard's credibility. Trial counsel was "disappointed" that Mr. Bailey was called to testify because that essentially disproved Mr. Hilliard's ability to plant the murder weapon inside the Petitioner's Cadillac because Mr. Hilliard's whereabouts were then accounted for prior to the Petitioner's purchasing the Cadillac.

When asked if he considered impeaching Mr. Bailey at trial, trial counsel said that he "did to a certain extent." Trial counsel then confirmed his awareness that, prior to the Petitioner's trial, Mr. Bailey had been censured by the Board of Professional Responsibility and that he "may have been suspended for inappropriate conduct"; however, trial counsel noted that such "conduct occurred prior to 2010 and that conduct [involved] dereliction of client's matters." Trial counsel also knew that there were pending complaints against Mr. Bailey at the time of the Petitioner's trial, but Mr. Bailey was not disbarred until 2012. Trial counsel averred that he would have had no hesitation about impeaching a fellow lawyer if he had felt the need to do so and provided an example where he had done just that. In addition, trial counsel testified that he thought the jury would find Mr. Bailey's assertion "that he arrived at work at seven o'clock every day" farfetched, and trial counsel did not want to weaken his credibility with the jury by impeaching Mr. Bailey with "unfounded allegations" of misconduct. Trial counsel denied that his personal liking for Mr. Bailey clouded his professional judgment.

In federal court, trial counsel filed a motion to suppress the evidence found in the Petitioner's black Cadillac, asserting that the Petitioner "was not close to the Cadillac when he was detained or arrested by the officers" at the muffler shop. However, that motion was denied. Trial counsel confirmed that he did not make a specific challenge to the search warrant itself or to the Petitioner's being illegally detained without a warrant when his property was seized. While trial counsel did not believe that Detective Hanks intentionally placed false information in the search warrant, the warrant did contain "some inaccuracies," in trial counsel's opinion.

Trial counsel did not remember having any discussions with the Petitioner about filing a suppression motion in state court and did not remember the Petitioner's filing a pro se motion to suppress or demanding a suppression hearing during the July 26, 2010 motion for a continuance proceeding. According to trial counsel, the Petitioner "was more concerned about going to trial as fast as possible so [he] could get the same verdict" from the federal trial.

Regarding recusal of the trial judge, trial counsel had no recollection of whether the trial judge stated "on the record in that July pretrial hearing when the continuance was

granted that [the Petitioner] would have an absolute right to transfer to a different division for review of the warrant[.]" Trial counsel "may have told [the Petitioner] that [he] would get a fair trial" in the trial judge's courtroom.

Rachel Geiser testified that she worked on the Petitioner's defense team as "the guilt-innocence investigator" and that she assisted with the Petitioner's cases in both federal and state court. She interviewed some of the federal jurors following the Petitioner's acquittal on the firearm charge, and she would have prepared "reports" on those interviews and given them to trial counsel. Ms. Geiser acknowledged that she did not investigate Javier Bailey, explaining that Mr. Bailey was not "an actual fact witness" because Mr. Bailey "was called to bolster" Mr. Hilliard's testimony that Mr. Hilliard was in Mr. Bailey's office at a certain time.

The Petitioner testified that trial counsel failed to file certain pretrial motions. The Petitioner stated that he requested a <u>Franks</u> hearing on the search warrant while speaking with the trial judge on July 26, 2010, when the State's motion for a continuance was granted. The Petitioner also claimed that he asked trial counsel to file a suppression motion but that trial counsel declined, instead telling the Petitioner that he would say at a post-conviction proceeding that he should have filed a suppression motion.

As for specifics of a suppression motion, the Petitioner said that he wanted a suppression motion filed because the police searched the Cadillac before a warrant was issued. According to the Petitioner, the police came to the muffler shop with guns drawn and took the Petitioner's keys out of his pocket. The Petitioner said that the Cadillac was forty or fifty feet away from him when he was arrested and claimed that he had "never set foot in that car." The Petitioner averred that he could see officers searching his car and that no one would tell him why he was being arrested. The Petitioner further claimed that there were false statements in the search warrant affidavit—those being that there was no currency found at the scene, that Mr. Macklin was unaware of how the Petitioner left the scene when his statement to the police indicated otherwise, and that the owner of the muffler shop said that he saw the Petitioner in the black Cadillac. The Petitioner also believed that he was arrested without probable cause and detained "under an unlawful forty-eight-hour hold[.]"

The Petitioner felt that the search of the car was illegal. When asked if the Petitioner as a federal probationer consented to a search of his property and car without objection, he said that he did not.

According to the Petitioner, trial counsel did not file a motion for recusal of the trial judge, which the Petitioner wanted because the trial judge signed the search warrant and the trial judge's "reviewing the evidence and having prior knowledge of this case." The Petitioner also claimed that trial counsel failed to inform him of his constitutional

right to have a trial judge other than the one who signed the search warrant. Moreover, the Petitioner averred that the trial judge had an ex parte communication "with one of the head deputies" about the Petitioner's being "a dangerous and vicious individual[,]" which led to the heightened security measures at trial, showing that the trial judge had a preformed opinion of the Petitioner.

Additionally, the Petitioner asserted that trial counsel failed to adequately investigate Javier Bailey. The Petitioner confirmed that trial counsel presented the defense in federal court that the Petitioner was essentially set up by Mr. Hilliard, which was what the Petitioner wanted at the state trial.

MPD Detective Joe Stark testified that he spoke with both Mr. Macklin and Mr. Hilliard after the victim's death and that he knew they both had "extensive experience" with the criminal justice system. Although Detective Stark had no prior interaction with either of these individuals, he found them believable about the circumstances surrounding the victim's death because they were admitting involvement in a drug transaction.

Detective Stark recalled that the Petitioner was placed in an interrogation room within a few hours after his arrest. According to Detective Stark, the Petitioner refused to give a statement. Detective Stark also testified that he was involved in preparing the forty-eight-hour-hold paperwork for the Petitioner following the Petitioner's arrest. Detective Stark had the arrest ticket and affidavit of complaint stamped on May 21st.

Sergeant Alisa Styles, the keeper of the Shelby County Jail's records, confirmed that the Petitioner first arrived at the jail on May 21, 2008. She stated that, at 12:52 p.m. on May 22, 2008, the Petitioner was "located from post-booking to Lower Level C to a housing unit." At that time, the Petitioner was to be segregated from other inmates, although the records did not indicate the reason for segregation other than the Petitioner had "pending charges." Sergeant Styles confirmed that the Petitioner was sent to court at approximately 7:56 a.m. on May 27, 2008, to see a magistrate. She could not discount the possibility that the Petitioner had a video arraignment on May 23.

Terrance Johnson, the owner of the muffler shop where the Petitioner was arrested, testified. Mr. Johnson stated that he did not see the Petitioner drive onto the lot on the morning of May 21, 2008. When the police asked Mr. Johnson that day what car the Petitioner arrived in, Mr. Johnson told them that he did not know but that the Petitioner had called earlier and asked to have some work done on a Cadillac. Mr. Johnson conveyed that he spoke with an officer while standing in front of the trunk of the Petitioner's Cadillac, that he saw the doors of the Cadillac open at that time, and that he saw paperwork in an officer's hands.

The Petitioner entered a multitude of exhibits to the post-conviction hearing. Those exhibits include: a copy of the search warrant; the typewritten statements of Mr. Hilliard and Mr. Macklin; a transcript of the federal suppression hearing conducted on November 20, 2009; a July 26, 2010 transcript of the motion for a continuance; the trial transcript of the cross-examination of Detective Hanks; a one-page computer print-out showing the various dates and actions of disciplinary proceedings against Javier Bailey by the Board of Professional Responsibility; a "Petition for Discipline" filed against Mr. Bailey on September 16, 2009; a supplemental disciplinary petition filed against Mr. Bailey on April 28, 2010; an April 26, 2012 press release showing Mr. Bailey's disbarment; the trial transcript of Mr. Bailey's examination; the Petitioner's May 21, 2008 arrest ticket; the affidavit of complaint; the Petitioner's jail records; the Petitioner's intake papers; certificates earned by the Petitioner while incarcerated; an August 5, 2010 pretrial motion transcript about the enhanced courtroom security measures; and the transcript of the motion for new trial.

After the conclusion of the proof, the post-conviction court denied the Petitioner relief in an extensive written order filed on April 11, 2016, concluding therein that the Petitioner had failed to establish his claims of ineffective assistance of counsel. This timely appeal followed.

ANALYSIS

On appeal, the Petitioner argues (1) that trial counsel was ineffective for failing to inform the Petitioner that he had a constitutional right to a trial before a different judge than the one who signed the search warrant for the Petitioner's automobile; (2) that trial counsel was ineffective for failing to seek recusal of the trial judge because the trial judge had an ex parte communication with a head deputy that led to enhanced courtroom security procedures, evincing the trial judge's bias against the Petitioner, and because the trial judge was the same judge who issued the search warrant; (3) that trial counsel was ineffective for failing to challenge the warrantless search of the Petitioner's vehicle, failing to challenge the search warrant by requesting a Franks v. Delaware, 438 U.S. 154 (1978) hearing,[3] and failing to challenge the Petitioner's illegal detention effectuated without probable cause and without an arrest warrant and solely for the purpose of gathering additional evidence against the Petitioner; and (4) that trial counsel failed to adequately impeach an attorney witness who was facing disciplinary action by the Board

---

[3] The Supreme Court in Franks held that, if a criminal defendant makes a sufficient showing that an affiant knowingly, intentionally, or recklessly included in a search warrant affidavit a false statement material to probable cause, the Fourth Amendment requires the court to conduct an evidentiary hearing at his request. 438 U.S. at 171-72.

-11-

of Professional Responsibility at the time of the Petitioner's trial. We will address each of the Petitioner's issues in turn.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine

-12-

confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

## I. *Right to Different Judge and Recusal*

The Petitioner argues that trial counsel was ineffective for failing to inform him that he had a constitutional "right to have a different judge oversee the trial than the judge who issued the search warrant," citing Hamilton v. State, 403 S.W.2d 302 (Tenn. 1966), in support of his assertion. In that same vein, the Petitioner argues that trial counsel was ineffective for failing to file a motion to recuse the trial judge because the trial judge had an ex parte communication with a head deputy that led to enhanced courtroom security procedures, evincing the trial judge's bias against the Petitioner, and because the trial judge was the same judge who issued the search warrant for the Petitioner's automobile. The Petitioner also notes that he "asked for a recusal" of the trial judge during the hearing on the State's motion for a continuance and that the trial judge told him at the motion for new trial hearing that he "would have been entitled to . . . a recusal, if he had asked for it." Finally, while acknowledging that in Hawkins v. State, 586 S.W.2d 465 (Tenn. 1979), our supreme court "pointed out that issuing a search warrant does not automatically make a judge impartial," the Petitioner asserts that this case "is different due to allegations of the affiant['s] withholding information about the informant from the issuing judge." According to the Petitioner, the trial judge "would have been a potential fact witness during any motion to suppress." He concludes, "The prejudice in this case was that the motion for recusal would have resulted in a trial in a different courtroom with a completely different trial and sentencing judge and a potentially different prosecutor."

-13-

The State responds that the post-conviction court did not err "because Tennessee law does not forbid a judge who signed a search warrant from sitting in judgment of a case." According to the State, a motion to recuse would have been futile based upon the holding in Hawkins and, therefore, the Petitioner has not established deficient performance.

The Petitioner filed a reply brief, contending that, regardless of the Hawkins court's holding, "the State cannot escape the reality that the trial court explicitly agreed recusal might have been proper, had counsel for [the Petitioner] raised the issue." The Petitioner also notes the heightened security measures at trial due to an ex parte communication as further evidence of the trial judge's bias and submits that his "request for disqualification was not based solely on the search warrant[.]" The Petitioner continues, although "[t]rial counsel opposed the heightened security measures," trial counsel "did not seek disqualification" of the trial judge despite the Petitioner's request.

The Petitioner claims that, at the motion for new trial hearing, the trial judge stated the Petitioner "would have been entitled to a Franks hearing and a recusal, if he had asked for it." That is somewhat of an overstatement of the trial judge's commentary at the motion for new trial hearing. Instead, the trial judge made the following remarks indicating that he would have allowed another judge to hear the suppression issue if he had been asked: "[I]f anyone wanted to challenge this search warrant that I would allow this to be randomly assigned back to the Criminal Court Clerk's Office to give to another [j]udge, to hear the search warrant issue."; "[I]f [trial counsel] had wanted me to have a hearing on the search warrant, I would have been glad to have let another [j]udge do it."; and "I would have been glad to recu[se] myself of any suppression motion, if been asked, but I was never asked to and we never had a hearing on the warrant." None of these comments signify that the trial judge would have recused himself from presiding over the Petitioner's trial. Even so, any gratuitous comments made by the trial judge at the motion for new trial hearing are not binding on this court regarding the ultimate issues presented here.

A trial judge "is not disqualified from hearing a case because he or she has knowledge of the facts of the case." State v. Thornton, 10 S.W.3d 229, 237 (Tenn. Crim. App. 1999) (citing State ex rel Phillips v. Henderson, 423 S.W.2d 489, 492 (Tenn. 1968)). Likewise, a judge "who initially issues a search warrant is not thereafter so interested in the cause as to be disqualified[.]" Hawkins, 586 S.W.2d at 466.

What is more, this court has already addressed the issue of the Petitioner's right to a different trial judge. The Petitioner appealed the summary dismissal of his May 2016 pro se petition for a writ of habeas corpus, wherein he argued that the trial judge's signing the search warrant and presiding over his trial deprived the trial court of jurisdiction. See Sheddrick Harris v. Randy Lee, Warden and State of Tennessee, No.

-14-

E2016-01573-CCA-R3-HC, 2016 WL 7176984, at *1 (Tenn. Crim. App. Dec. 9, 2016), perm. app. denied (Tenn. Mar. 9, 2017).  In his habeas corpus petition, the Petitioner again relied on Hamilton, 403 S.W.2d 302, and the trial judge's comments at the motion for new trial hearing in support of his argument.  Id. at *1.

This court first stated that the Petitioner's reliance on Hamilton was misplaced, reasoning as follows:

> In Hamilton, the defendant sought appellate relief on the basis that the criminal court judge who presided over the defendant's trial had also issued the arrest warrant in his capacity as a general sessions court judge.  [403 S.W.2d] at 302.  Our supreme court concluded that the defendant's constitutional rights were violated by the judge's signing the arrest warrant in his capacity as a general sessions court judge and by the same judge's presiding over the defendant's trial in his capacity as a criminal court judge.  Id.; see Tenn. Const. art. 6, § 11 ("No Judge of the Supreme or Inferior Courts shall preside on the trial of any cause . . . in which he may have presided in any inferior Court, except by consent of all the parties."); T[enn]. C[ode] A[nn]. § 17-2-101(4) (2009) ("No judge . . . shall be competent, except by consent of all parties, to sit . . . [w]here the judge . . . has presided on the trial in an inferior court[.]"); see also Hawkins[], 586 S.W.2d [at] 465 []).

Harris, 2016 WL 7176984, at *2.  After deciding that the constitutional violation at issue in Hamilton was cognizable in a post-conviction proceeding not a habeas corpus petition, this court nonetheless addressed the merits of the issue and, noting the procedural posture of the case, determined that the Petitioner was not entitled to relief.  Id. at *3.  In so concluding, this court explained,

> [T]he record reflects that the judge who signed the search warrant and who presided over the trial acted, in both instances, pursuant to his authority as a criminal court judge.  Nothing prohibits a criminal court judge from issuing a search warrant relative to an individual's property and later presiding over the individual's criminal trial.  The search warrant attached to the petition for a writ of habeas corpus reflects that it was issued on May 21, 2008, by Criminal Court Judge Chris Craft.  The record also reflects that the same judge, in his capacity as a criminal court judge, presided over the Petitioner's trial.

Id.  Therefore, no inferior court was involved; article 6, section 11 of the Tennessee Constitution was not implicated; and no constitutional provisions were violated.

-15-

Again, the Petitioner is not entitled to relief. We agree with the post-conviction court that a trial judge's issuing a search warrant would not disqualify the same judge from presiding over the case at a later date and that the Petitioner has failed to prove ineffective assistance of counsel for any failure to be so informed. E.g., Herman McKinley v. State, No. W2016-02351-CCA-R3-PC, 2018 WL 799166, at *5 (Tenn. Crim. App. Feb. 8, 2018) (citing Harris, 2016 WL 7176984, at *3); State v. William Lance Walker, No. M2011-02588-CCA-R3-CD, 2013 WL 5436704, at *14 (Tenn. Crim. App. Sept. 27, 2013) (citing Thornton, 10 S.W.3d at 237).

Furthermore, the Petitioner has also not established his factual allegation by clear and convincing evidence that the trial judge would be required to testify as a fact witness in this case regarding the falsity or truth of the affiant's statements in the search warrant affidavit. If the falsity of certain statements in the affidavit is established by a preponderance of the evidence, then the falsehoods are removed from the affidavit, and the court will determine whether the information remaining in the affidavit is sufficient to support a finding of probable cause. Franks, 438 U.S. at 155-56. We see no need, under normal circumstances, why the judge who issued the search warrant is a needed witness at a Franks hearing. The Petitioner's logic is "flawed because trial judges [are] asked to review their previous rulings on other matters, including whether to grant a motion for a new trial." See Walker, 2013 WL 5436704, at *13. "[T]he judicial system [is] based on the notion that trial judges review their own rulings for mistakes and erroneous findings." See id. "It has long been provided . . . that the magistrate who issues a search warrant may hear and determine any contests concerning its validity or the grounds upon which it was issued." See id. (quoting Hawkins, 586 S.W.2d at 465). The Petitioner has failed to demonstrate ineffective assistance in this regard.

Regarding trial counsel's failure to seek recusal due to any ex parte communication involving enhanced security procedures, the Petitioner argues that the State ignored this ground for post-conviction relief in its brief. However, the Petitioner did not mention this allegation on appeal until his reply brief. Issues raised for the first time in a reply brief are waived. See State v. Walter Francis Fitzpatrick, III, No. E2014-01864-CCA-R3-CD, 2015 WL 5242915, at *8 (Tenn. Crim. App. Sept. 8, 2015), perm. app. denied (Tenn. Feb. 18, 2016); State v. Franklin Sanders, No. 02C01-9305-CR-00102, 1994 WL 413465, at *10 (Tenn. Crim. App. Aug. 10, 1994) ("The defendant cannot change issues from his original brief to his reply brief any more than he can change theories from the trial court to the appellate court."), aff'd, 923 S.W.2d 540 (Tenn. 1996); see also Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7); Carruthers v. State, 814 S.W.2d 64, 69 (Tenn. Crim. App. 1991).

Waiver notwithstanding, the August 5, 2010 pretrial motion transcript reflects that the trial judge implemented heightened security measures after a discussion with "[his]

head deputy" about the dangerousness of the Petitioner.  The transcript indicates that the trial judge imposed these procedures in light of the Petitioner's record, which included intimidating a witness, "the alleged facts of the case, from talking with the State of Tennessee, . . . [and] input from the Federal Gang Task Force."  Accordingly, the trial judge was informing the Petitioner and his counsel about the nature of those conversations.  Moreover, trial counsel did object to the heightened security measures and that issue was raised in the Petitioner's direct appeal.  On direct appeal, this court concluded that "the trial court did not abuse its discretion by imposing additional security measures in the courtroom[,]" properly "consider[ing] the particular circumstances presented in this case and t[aking] appropriate measures to protect all the participants in the trial."  Harris, 2012 WL 29203, at *10.  This court further determined that the Petitioner had not "establish[ed] that the increased security measures utilized by the trial court prejudiced his trial."  Id. (citing State v. Taylor, 771 S.W.2d 387, 396 (Tenn. 1989)).  In light of these findings on direct appeal, the Petitioner has shown neither deficient performance nor prejudice for trial counsel's failure to seek recusal of the trial judge on this ground.

Finally, the Petitioner contends that the post-conviction court erred by relying on trial counsel's testimony that he believed the Petitioner could get a fair trial in the trial judge's courtroom as a basis for "ruling that failing to file a motion for recusal was a matter of trial strategy."  According to the Petitioner, "nothing in the record indicates failing to file a motion for recusal was a tactical or strategic decision."  Because the Petitioner's underlying issues regarding recusal of the trial judge are without merit, trial counsel was not required to file a futile motion irrespective of the deliberate nature of the decision.  See, e.g., Kyrie T. Adams v. State, No. W2011-02051-CCA-R3-PC, 2012 WL 6206043, at *6 (Tenn. Crim. App. Dec. 11, 2012) ("As such, trial counsel's failure to file a motion on grounds that would have ultimately been fruitless cannot be considered ineffective assistance of counsel.").

## II. *Motion to Suppress*

The Petitioner contends that trial counsel was ineffective because he failed to file a motion to suppress challenging the initial warrantless search of his car, the subsequent search warrant affidavit, and the failure to promptly take him before a magistrate after his arrest.  Because it is important to our resolution of these issues, we note that trial counsel did file a motion to suppress the evidence in the Petitioner's federal case challenging the Petitioner's arrest and the search of the black Cadillac.  Although the written motion itself is not a part of the record on appeal, the transcript of the federal suppression hearing is included.  The federal judge denied suppression of the evidence, concluding that there was probable cause for the Petitioner's arrest, that there was not a full search of the car prior to the issuance of the warrant, that the search warrant was valid, and that even if the

warrant was invalid, the search would have been justified as either incident to a valid arrest or under the inevitable discovery doctrine.

## A. *Warrantless Search and Search Warrant*

The Petitioner submits that officers searched his car outside of the muffler shop before securing a search warrant. The Petitioner also alleges that the following three statements made by Officer Hanks in the affidavit supporting the search warrant were false: (1) "[N]o currency was found on the scene."; (2) "Macklin did not know how [the Petitioner] left the scene."; and (3) "Terrance Johnson told officers that he saw [the Petitioner] in this black Cadillac." Accordingly, trial counsel, in the Petitioner's opinion, should have filed a motion for a hearing pursuant to Franks. The State replies that trial counsel made a reasonable strategic decision not to file a suppression motion in state court when the matter had been "fully litigated" unsuccessfully in federal court, instead, "focus[ing] his time and efforts elsewhere rather than hoping for some different result in state court based on the vague possibility of the Tennessee Constitution's providing some greater protection."

Regarding the initial warrantless entry into the Petitioner's automobile at the muffler shop, MPD Officer Michael Garner testified at the federal suppression hearing that he did not search the Petitioner's Cadillac on the scene. Officer Garner did admit to briefly entering the vehicle: "I opened the driver's side door to make sure there was no damage inside the vehicle and maybe list items of value that may have been in the car to remove liability when we send it to our lot for storage." Officer Garner stated that he observed only "registration papers and a couple of tickets sitting under the center armrest." This was confirmed by Detective Hanks's testimony at the Petitioner's trial. Harris, 2012 WL 29203, at *5. None of the evidence obtained during the preliminary entry of the Petitioner's car was used to obtain the search warrant, and all other items inside the car—the murder weapon and money—were seized after the search warrant was secured. Based upon Officer Garner's testimony, these items were in plain view. Nonetheless, the evidence was discoverable pursuant to exceptions to the warrant requirement discussed below.

Turning to the Franks issue, the United States Supreme Court has concluded that evidence seized pursuant to a search warrant is subject to suppression when the supporting affidavit includes deliberate or recklessly false statements by the affiant that are material to the establishment of probable cause. 438 U.S. at 155-56. Our Tennessee Supreme Court has concluded that two circumstances exist that "authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the [c]ourt . . . and (2) a false statement, essential to the establishment of probable cause, recklessly made." State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978). "Recklessness may be established by showing that a statement was false when made and

that affiant did not have reasonable grounds for believing it, at that time." Id. "[F]raudulent misrepresentation of a material fact will invalidate a search warrant." Id. at 406. However, "[a]llegations of negligence or innocent mistakes are insufficient to invalidate the search warrant." State v. Yeomans, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999); see Franks, 438 U.S. at 171. In order to invalidate a search warrant, the false statement must be "the only basis for probable cause set out in the affidavit." State v. Tidmore, 604 S.W.2d 879, 882 (Tenn. Crim. App. 1980).

We agree with the State and the post-conviction court that trial counsel had the unique benefit of hindsight and made a strategic decision not to file a similar motion in state court. While it is accurate that the Tennessee Constitution provides more protection than the Fourth Amendment, the Petitioner provides no explanation as to how this would have changed the results of a motion to suppress in state court, and we know of none. Because there was no apparent reason to anticipate any more success with the same suppression motion in state court, we do not question counsel's strategical decision. See e.g., Bruce Reliford v. State, No. W2012-02339-CCA-R3-PC, 2013 WL 6199280, at *9 (Tenn. Crim. App. Nov. 27, 2013) (noting that trial counsel "had the unique benefit of hindsight" because "the case had already been tried in federal court, and they knew which strategies were unsuccessful").

While we also believe it is true that the Petitioner has failed to show that he was entitled to a Franks hearing, we decline to digress into a lengthy discussion on whether the statements made by Officer Hanks in the affidavit were reckless in nature or whether the search warrant was supported by probable cause without those statements. This is so because, even if the search warrant was invalid, we agree with the federal court and the post-conviction court that the police lawfully searched the Petitioner's Cadillac pursuant to valid exceptions to the warrant requirement.

At the outset, we note our agreement with the post-conviction court and the federal court that the Petitioner's arrest was supported by probable cause. "Probable cause for an arrest without a warrant exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" State v. Bridges, 963 S.W.2d 487, 491 (Tenn. 1997) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). The police had the statements of Mr. Hilliard and Mr. Macklin indicating that they helped arrange a drug deal between the Petitioner and the victim on the evening the victim was shot and killed. Mr. Macklin was present when the Petitioner tried to rob the victim, made him undress, and shot him in the leg. Mr. Macklin dialed 9-1-1 when he later discovered the victim and waited until police arrived. Mr. Hilliard stated that he picked up the Petitioner near the victim's home, that the Petitioner had a black bag in his possession at that time, and

that the Petitioner made some questionable statements during the car ride indicating that he had taken some money from the victim. The victim was found shot to death inside his Memphis home, and a substance that appeared to be cocaine was present therein. Therefore, the Petitioner has failed to show deficient performance from trial counsel's failure to challenge the Petitioner's arrest for lack of probable cause.

Next, turning to the inventory exception to the warrant requirement, law enforcement had the option of having the Petitioner's car towed and subsequently searched; a procedure that occurred in this case. See State v. Clay Stuart Gregory, No. M2012-00546-CCA-R3-CD, 2013 WL 6187919, at *20 (Tenn. Crim. App. Nov. 25, 2013) (holding that a warrantless search could be conducted after the seizure of the automobile); State v. Carrie Lynn Ronewicz, No. W2011-01332-CCA-R3-CD, 2012 WL 6719646, at *20 (Tenn. Crim. App. Dec. 26, 2012) (same). While the State must show that impounding the vehicle was necessary, see State v. John Beasley Seay, No. M2011-02769-CCA-R3-CD, 2013 WL 3777169, at *6 (Tenn. Crim. App. Jul. 16, 2013), the search would have likely been justified pursuant to this exception. There is nothing in the direct appeal record to show that impounding the Petitioner's car was inappropriate under the guidelines set forth in Drinkard v. State, 584 S.W.2d 650, 652-53 (Tenn. 1979).[4] Therefore, "it was incumbent on the Petitioner to establish an adequate record at his post-conviction hearing upon which this [c]ourt could determine the likelihood of success of a motion to suppress." Jason Lee Fisher v. State, No. M2014-02327-CCA-R3-PC, 2015 WL 5766521, at *6 (Tenn. Crim. App. Oct. 2, 2015) (quotation omitted).

In addition, applying the automobile exception to the warrant requirement, courts of this state have upheld warrantless vehicle searches when law enforcement had probable cause to believe that the vehicle contained contraband or evidence of criminal activity. See State v. Leveye, 796 S.W.2d 948, 949 (Tenn. 1990) (upholding the search of a defendant's car after his arrest pursuant to the automobile exception where the car was parked in a truck stop lot approximately seventy-five yards from the place where the defendant was arrested); Ronewicz, 2012 WL 6719646, at *20 (concluding that the victim's identification of stolen items in the van gave probable cause to search); State v. Jason Paul Sherwood, No. M2005-01883-CCA-R3-CD, 2007 WL 189376, at *9 (Tenn.

---

[4] In Drinkard, our supreme court set forth guidelines to determine the validity of an inventory search of a vehicle:

> [I]f the circumstances that bring the automobile to the attention of the police in the first place are such that the driver, even though arrested, is able to make his or her own arrangements for the custody of the vehicle, or if the vehicle can be parked and locked without obstructing traffic or endangering the public, the police should permit the action to be taken rather than impound the car against the will of the driver and then search it. Just cause to arrest the driver is not, alone, enough; there must also be reasonable cause to take his vehicle into custody.

584 S.W.2d at 653.

Crim. App. Jan. 26, 2007) (concluding that there was probable cause to search a van when police knew that a shooting had occurred two hours earlier at a salvage yard and a suspect had driven off in a white van, and when the defendant and van matched the description of the suspect, the defendant was present in an area that the suspect was thought to live, and there was an engine visible in the van's interior); State v. Leslie Darrell Debord, No. E2001-02808-CCA-R3-CD, 2003 WL 21476507, at *5-6 (Tenn. Crim. App. June 26, 2003) (finding probable cause to seize the truck when police found a stolen ATV in a secluded area next to the truck which was still warm and contained machinery in the back); State v. Andre Anthony, No. W2002-01377-CCA-R3-CD, 2003 WL 23100339, at *11 (Tenn. Crim. App. Dec. 30, 2003) (concluding that, when the defendant was apprehended while trying to use a stolen credit card, had no identification other than the victim's, and was parked nearby in a public parking lot, there was probable cause to believe that the vehicle contained other property reported stolen and belonging to the victim); Tony A. Makoka v. State, No. 01C01-9603-CC-00124, 1997 WL 469528, at *3 (Tenn. Crim. App. Aug. 15, 1997) (determining probable cause existed to search a vehicle when a shooting had just taken place, police saw the petitioner standing in the area with or near a gun, and ammunition could be seen in the vehicle). Accordingly, the Petitioner has failed to establish ineffective assistance of counsel in this regard.

### B. *Illegal Arrest*

The Petitioner also argues that trial counsel was ineffective for failing to file a motion to suppress "evidence and statements obtained as a result of the [Petitioner's] being held in custody without an arrest warrant" in violation of State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996), and County of Riverside v. McLaughlin, 500 U.S. 44 (1991). According to the Petitioner, he was arrested on May 21, 2008, without the issuance of an arrest warrant, and he was not taken before a magistrate until May 27, 2008. The Petitioner contends that the MPD arrested him without probable cause "in order to develop sufficient evidence to establish probable cause" and that he "was not brought in front of the magistrate because the State needed time to establish a basis for the arrest."

The State responds that the Petitioner's arrest "was legal and founded upon probable cause and [that] the exclusionary rule does not apply to evidence obtained before a legal detention exceeds forty-eight hours in duration[.]" Accordingly, the State surmises that the Petitioner has failed to establish his ineffective assistance of counsel claim.

In Huddleston, our supreme court held that a judicial determination of probable cause must occur within forty-eight hours of a warrantless arrest to protect a defendant's Fourth Amendment rights. 924 S.W.2d at 672 (adopting McLaughlin, 500 U.S. 44). A confession obtained in violation of this forty-eight-hour time line is subject to being excluded under a "fruit of the poisonous tree" analysis. Id. at 674.

-21-

The Petitioner asserts that "evidence and statements" should be excluded as "fruit of the poisonous tree" because they were obtained during his illegal detention while the police built a case against him. It appears that the Petitioner is maintaining that the evidence seized from his car, which was searched the same day he was arrested, should have been suppressed due to his illegal detention. He also notes that, "[w]hile this case did not directly deal with a confession," he was brought "to the homicide bureau for questioning immediately after his arrest." While the Petitioner was questioned "immediately after his arrest" at the homicide bureau, Detective Stark testified that the Petitioner refused to give a statement. The Petitioner provides little insight into what, if any, statements were used against him at trial that should have been suppressed.

Regardless, the Petitioner makes no real argument that any evidence was obtained after the forty-eight-hour-mark; instead, his argument is that he was arrested without probable cause and thereafter illegally detained. A delay shorter than forty-eight hours may still be unreasonable and unconstitutional if it is "for the purpose of gathering additional evidence to justify the arrest" or if it is "motivated by ill will against the arrested individual[.]" McLaughlin, 500 U.S. at 56. As discussed above, the Petitioner's arrest was based upon probable cause. Thus, in order to prevail on a Huddleston claim, the Petitioner would have been required to show that the government delayed the probable cause hearing for unreasonable purposes, such as out of ill will or to gather additional evidence. See McLaughlin, 500 U.S. 56-57. In the record, there is no evidence of any such unreasonable purpose. Consequently, even if trial counsel had raised this issue in a motion to suppress, the trial judge would have been compelled to find that there was no Huddleston violation. When, for Strickland purposes, the Petitioner's allegations of deficient conduct is that his counsel failed to raise a claim that would have been denied in any event, it is clear that the Petitioner has failed to demonstrate ineffective assistance of counsel. See, e.g., Oscar C. Wells v. State, No. W2009-02231-CCA-R3-PC, 2010 WL 3583967, at *3 (Tenn. Crim. App. Sept. 15, 2010) (finding no ineffective assistance of counsel for failing to raise a Huddleston issue).

Moreover, as noted above, trial counsel did file a motion to suppress in federal court, challenging the Petitioner's arrest, but the federal judge determined that the Petitioner's arrest was based upon probable cause. Again, trial counsel made a strategical judgment not to file a similar motion in state court. Therefore, the post-conviction court did not err in denying the Petitioner's request for relief.

III. *Impeachment of Javier Bailey*

As his final issue, the Petitioner avers that trial counsel was ineffective for failing to impeach attorney Javier Bailey with evidence of his disciplinary infractions. According to the Petitioner, Mr. Bailey "was called [at the Petitioner's trial] to establish that . . . Rocky Hilliard was at Mr. Bailey's office and could not have planted a gun in the

black Cadillac." The Petitioner maintained that, because Mr. Bailey "faced charges of lack of candor to the tribunal and lack of diligence" at the time of the Petitioner's trial, trial counsel should have attempted to impeach Mr. Bailey's testimony that he arrived at 7:00 a.m. every morning for work. The Petitioner contends that trial counsel's decision not to do so was unreasonable. The State asserts the counter proposition, asserting the reasonableness of trial counsel's strategy.

Trial counsel said that he was aware of allegations against Mr. Bailey at the time of the Petitioner's trial. Trial counsel testified, however, that he believed Mr. Bailey's testimony that he arrived at the office at 7:00 a.m. daily was inherently unbelievable and that he did not want to attack another lawyer in front of the jury with matters that had not yet been adjudicated. The post-conviction court found that this was "a matter of trial strategy made with full information." We agree.

Initially, we note that our review of Mr. Bailey's trial testimony does not uncover the statement to which the Petitioner refers regarding Mr. Bailey's everyday arrival at 7:00 a.m. Mr. Bailey testified that, after Mr. Hilliard phoned him in "wee hours of the morning" on May 21, 2008, he told Mr. Hilliard to meet him at his office before it opened at 8:00 a.m. Mr. Bailey stated simply that "[he] g[o]t up very early anyway, and so he told [Mr. Hilliard] that [he] would meet [Mr. Hilliard] at [his] office when nobody else was there[,]" i.e., prior to 8:00 a.m.

Moreover, the Petitioner asserts that, prior to his trial, Mr. Bailey's license had been suspended once already and that Mr. Bailey had been censured. From the documentation submitted at the post-conviction hearing, all that is apparent is that Mr. Bailey was "on probation" with the Board of Professional Responsibility in 2004 and that he was censured in 2007. While petitions for discipline had been filed against Mr. Bailey at the time of the Petitioner's trial, Mr. Bailey was not disbarred until April 2012. Besides, Detective Stark testified at the federal suppression hearing corroborating much of Mr. Bailey's trial testimony. Detective Stark said that Mr. Hilliard arrived at the police station around 10:00 a.m. on May 21, 2008, accompanied by Mr. Bailey. Detective Stark also relayed that Mr. Bailey had phoned him "first thing in the morning" when Detective Stark arrived at work. We cannot conclude that trial counsel was deficient for failing to impeach Mr. Bailey with mere allegations of misconduct, the introduction of which may have resulted in a mini-trial concerning those collateral matters and unnecessarily alienated the jury.

In addition, the Petitioner asserts that "the testimony of Javier Bailey was one of the only distinctions in proof from the federal trial" and that, "had trial counsel properly impeached the witness, a reasonable probability exists that the result would have been different, and would have resulted in an acquittal like the federal trial." We cannot assess the veracity of the Petitioner's claim without the record of the federal trial. We only

know that the Petitioner was acquitted of a federal firearm possession charge in connection with these events. As such, we cannot speculate what might have happened at the Petitioner's state trial had Mr. Bailey been so impeached. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding that, when an ineffective assistance of counsel claim is predicated upon trial counsel's failure to present witnesses or introduce evidence, such witnesses' testimony and evidence should be offered at the evidentiary hearing in order for the post-conviction court to determine whether the failure to call a witness or introduce evidence prejudiced the petitioner). The Petitioner has failed to demonstrate that he was prejudiced by trial counsel's alleged failure.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
D. KELLY THOMAS, JR., JUDGE